**Link-Sulzbach Corp. v. Robinson**

*Mark D. Turetsky,* for plaintiff.
*Kenneth D. Berman,* for defendants.

BROWN, *J.,* March 25, 1992—In July of 1985 defendant, Fred I. Robinson, invited Dennis Link, the president of plaintiff Link-Sulzbach Corp., to submit a bid for electrical work in a building Robinson was renovating

at 614 Hollywood Avenue in Cherry Hill, New Jersey.[1] On August 8, 1985, Link received a set of electrical plans, E-1, E-2, from the project's architect, Ivan Blitz (Blitz Group plans) and, after discussing those plans with Robinson and Steve Metzler, Robinson's office manager, Link submitted a proposal for $66,000.

Robinson informed Link that this figure was high and that he'd "appreciate it if [Link] could do something to get that [bid] down." Link consequently redesigned some of the lighting on the Blitz Group plans and lowered his bid to $60,000. When they agreed to the price Robinson and Link shook hands and Robinson said, "Fine, begin."[2]

On August 16, 1985, at Robinson's request, Link submitted a letter outlining the scope of the bid; it states:

"We are pleased to confirm our arrangement to perform the electrical work specified at subject location. This work *will include all electrical work specified on drawings from the Blitz Group E-1, E-2, dated August 1, 1985,* as amended in subsequent discussions.

"Specifically, our work will include the following:...

"Our estimate to complete this work as discussed with you is $60,000."

---

1. Defendant Robinson is the principal of 614 Hollywood Avenue Associates, National Keystone Products Co. and Mycone Dental Inc. Dennis Link is the president and sole shareholder of Link-Sulzbach Corp., an electrical construction company; Link also directs an electrical group of Willard Inc. of Jenkintown.

2. Both Link and Robinson testified to this conversation and both agreed that their business dealings were normally confirmed by handshake.

On the same day that Link mailed this confirmation letter to Robinson, Steven Shore, an electrical engineer hired by Blitz, mailed Link-Sulzbach a second set of electrical plans (Shore plans). Although Link received the Shore plans sometime after the project started in late August 1985, Link-Sulzbach electricians used the Blitz Group plans as the basis of their work. This second set was similar to the first set but not identical; e.g. it required additional electrical circuitry and panels for a computer room.

Link-Sulzbach finished the electrical work in December 1985 and a certificate of completion was signed in January 1986. At the request of Robinson's representatives, Blitz and Stewart Krevolin, the construction coordinator, Link was asked to perform some of the "extra" work detailed by the Shore plans and he complied. All extras, however, were submitted first via change orders for Blitz and Krevolin to approve and these requests were initialed as "okay, not on print." "Not on print" meant not on the Blitz Group plans.

On August 26th, September 25th, October 7th, October 24th and November 21st Link-Sulzbach submitted invoices approved for payment totaling $67,754.23. (Each job order listed on these invoices was initialed by Blitz and/or Krevolin after they determined that the work had been done.) On October 24, 1985, and revised on November 6, 1985, the Blitz Group sent the plaintiff a "final punch list," a list of work which needed to be corrected or finished before the job could be considered complete. On December 5, 1985, Link, Krevolin and Blitz made a site inspection.

On December 26, 1985, after a meeting with Link, Blitz and Krevolin, the Blitz Group sent Link-Sulzbach

a letter detailing which invoices for additional work were approved for payment and which were not. The plaintiff, however, was not paid for any of the *approved* additional work. As of December 31, 1985, and continuing to the present, the defendants have paid only $50,000 of the total of $67,754.23 due.

On February 13, 1989, plaintiff filed suit against the defendants for breach of contract and demanded judgment in the amount of $17,754.23, together with costs, and interest from the date of demand, the date the invoices were mailed. The defendants responded with an amended answer with new matter and counterclaim filed September 8, 1989, alleging that plaintiff's work was incomplete, defective and in violation of the electrical code and demanded judgment "estimated not to be in excess of $20,000."

A bench trial was held on January 9, 10 and 11, 1991. On January 22nd, we found for the plaintiff and against the defendants in the sum of $23,302.43 plus costs. As part of costs, the plaintiff was also awarded $4,991 in counsel fees against all defendants for conduct in defense of this claim within the meaning of section 2503(7) and (9) of Title 42 Pa.C.S.

Post trial the defendants moved for judgment notwithstanding the verdict and/or a modification of the verdict and/or a new trial.

A trial court may enter judgment n.o.v. only in a clear case where, after reviewing the evidence in the light most favorable to the plaintiff, no reasonable minds could fail to agree that the verdict was improper. *Solomon v. Baum,* 126 Pa. Commw. 646, 650, 560 A.2d 878, 880, *appeal denied,* 578 A.2d 930 (1989).

A trial court's denial of a new trial motion is within its sound discretion and will not be reversed in the absence of a manifest abuse of that discretion or a clear error of law. *Id.* An appellate court's role is to determine whether the trial court committed an error of law which controlled the outcome of the case and led to an incorrect result. *Nacarati v. Garrett,* 352 Pa. Super. 437, 443, 506 A.2d 428, 430 (1986).

The defendants' first argument, that the weight of the evidence proves that the scope of the contract was defined by the Shore plans, not the Blitz Group plans, is patently false and unsupported by the evidence.

The scope of the work to be performed by Link-Sulzbach was set forth clearly in Link's letter to Robinson dated August 16, 1985, a letter which Robinson conceded he received but did not fully read. That letter states that "the work will include all electrical work specified on drawings from the Blitz Group E-1, E-2 dated August 1, 1985, as amended in subsequent discussions."

The uncontradicted evidence further demonstrates that the Shore plans were not issued or sent out until August 16, 1985, on or after the date of Link's letter to Robinson confirming their contractual relationship. Therefore, both parties knew or should have known that the Shore plans did not control the terms of the agreement. Logic demands that a bid based on the Blitz plans would not set a dollar cap for work called for in a second set never seen by Link.

Contrary to the defendants' contentions, Link was not told at the time he entered into the contract with Robinson that his bid was to include the work specified on the Shore plans or that Robinson mistakenly believed that the $60,000 bid was based on the Shore plans. Robinson

left the matter of plans and payment to his architect Blitz and paid no attention to the plans or to Link's August 16th letter. In fact, he stated he never reviewed any plans with Link and that he "didn't even know there were two sets of plans" until several days before the trial.

Moreover, Robinson and Link were the only witnesses who had any direct knowledge of the parties' contractual relationship; Blitz was told of the contract after he returned from vacation and was not involved in any negotiations. Nor did Shore, the electrical designer, testify that Link asked him when his plans would be completed, as the defendants now contend. When asked whether he could recall having any conversations specifically with Link about the job, Shore stated he did not recall what was said during his conversation with Link. The Blitz Group plans gave the plaintiff no reason to expect that additional designs would be forthcoming for bid purposes, since the final design page was labeled sheet "7 of 7."

The defendants' current position, that the Blitz Group plans were not the operative set, is also inconsistent with their actions during the performance of this contract. Throughout the course of the job Blitz and Krevolin authorized and approved as "extras" work from the Shore plans which was absent from the Blitz Group plans. In addition the "punch list" which Blitz prepared November 6th did not include any of the special work detailed by the Shore plans or the wiring about which the defendants now complain. Moreover, to this date defendants have not corrected any of the alleged defects or deficiencies in plaintiff's work.

The evidence clearly supports plaintiff's position that the Shore plans were not part of the bid, that the work

appearing on them was not plaintiff's obligation; that the work plaintiff performed was proper and suitable in all respects and that defendants' various arguments to the contrary are spurious and made in bad faith.

Defendants next offer the defense of mutual mistake. They claim no contract was formed because there was no meeting of the minds between Link and Robinson concerning the scope of Link-Sulzbach's bid proposal. This defense is advanced for the first time in a brief supporting post trial motions and is thus barred from consideration by Pa.R.C.P. 1032 which states that "a party waives all defenses and objections which he does not present by preliminary objection, answer or reply."

Notwithstanding its untimely assertion, the defense is groundless. In *Ingrassia Construction Co. v. Walsh,* 337 Pa. Super. 58, 66, 486 A.2d 478, 482-3 (1984), the Superior Court said that a true and actual meeting of the minds is not necessary to form a contract. In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter. *Id.*

In this case, Link and Robinson agreed on the price with a handshake after Link had discussed the Blitz Group plans with Robinson and Steve Metzler, the office manager. At the time of agreement the Shore plans had not been put in the mail so it is ludicrous to suggest that Robinson was "mistaken" as to what work the plaintiff agreed to perform. As Robinson, by his own admission cannot read electrical plans and never reviewed either the Blitz or the Shore plans, any "mistake" as to the scope of the project was due to his own inattention.

Where a mistake is unilateral and not due to the negligence of the party not mistaken, but to the negligence of the party acting under the mistake, no basis for relief is afforded. *Risiski v. Pribonis,* 326 Pa. Super. 545, 552, 474 A.2d 624, 627, *rev'd,* 511 Pa. 383, 515 A.2d 507 (1984); *Cobaugh v. Klick-Lewis Inc.,* 385 Pa. Super. 587, 593, 561 A.2d 1248, 1251 (1989).

Moreover the defendants' "objective manifestations of assent" confirm that they too treated the Blitz Group plans as the operative set of the contract. For example, the project supervisor, Stuart Krevolin, specifically authorized and approved as extra work certain items which were included in the Shore plans. If the defendants believed Link-Sulzbach was obligated to perform that work as part of its contract, why would they have approved these items as "extras" for which the plaintiff was entitled to additional payment?

Equally irreconcilable with such a claim is the fact that Blitz failed to include the unfinished items from the Shore plans on his punch list. If Link-Sulzbach had contracted for the Shore plans, surely any unfinished items from this plan would have appeared on this list.

There was no mistake by anyone. Robinson agreed to the $60,000 figure with knowledge that it was based on the Blitz plans, as amended.

The defendants next complaint is that this court improperly rejected the defendants' counterclaim and set-offs. As a basis for this claim defendants allege that (1) the wiring was improperly strung above the ceiling and was left lying on top of the ceiling tiles; (2) certain emergency lighting and self-contained exit lights shown

on both sets of plans were omitted; and (3) recharging outlets and exhaust fans were omitted.

The evidence in support of these claims, however, is contradictory and to the extent that it is not, fails to support defendants' position. For example, Stephen Gold, an electrician hired by the defendants to estimate the value of the counterclaim, testified that eight or nine months prior to trial he inspected the building and found wire lying on the ceiling tiles; he could not identify this defect as resulting from Link's work, however. In contrast, Link testified that when he was contacted by Robinson and Steve Metzler concerning the ceiling wiring, he went to the site on two occasions to show them the wires were supported by clips and properly installed. Robinson declined to look at the wiring but Steve Metzler did observe it and found it to be acceptable.

While the defendants now claim the wiring was improperly hung, the punch list prepared by Ivan Blitz does not include the wiring as an issue. In fact, Shore, the electrical engineer, admitted that he did not examine the wiring until April 1990, seven months after the defendants filed the counterclaim.

With regard to Link's allegedly wrongful failure to install emergency lighting and self-contained exit lights, the plaintiff offered credible testimony that these elements were omitted when the construction price was reduced. Link also testified that he had no personal knowledge of whether or not the recharging outlets for the forklifts had been omitted but neither he nor anyone else noticed they were missing. Significantly, none of the items which the defendants now demand as set-offs were listed as incomplete on the final "punch list." The evidence supporting defendants' setoff claims was spurious.

The defendants' next allegation is that we erred by improperly excluding Shore's expert testimony re the cost of emergency shut-off switches, the computer room panel and panel LPB. The defendants concede, however, that these items were not on the Blitz Group plans, which defined the scope of the contract. Evidence of these items was therefore irrelevant and properly excluded. The exclusion of evidence which is irrelevant, confusing, misleading, cumulative or prejudicial is within the sound discretion of the trial court. *Concorde Investments Inc. v. Gallagher,* 345 Pa. Super. 49, 56, 497 A.2d 637, 641 (1985).

Finally the defendants protest that their defenses and counterclaim were presented in good faith and thus it was error to award counsel fees of $4,991 against them. A party may be required to pay another party's counsel fees if the court finds that the party's conduct during the pendency of the matter was "dilatory, obdurate or vexatious," or if the party's conduct in commencing the action or otherwise was "arbitrary, vexatious or in bad faith." 42 Pa.C.S. §2503; *Brenckle v. Arblaster,* 320 Pa. Super. 87, 94, 466 A.2d 1075, 1078 (1983); *In re Roos Estate,* 305 Pa. Super. 86, 90-92, 451 A.2d 255, 256-9 (1982). If the record supports the court's finding that defendants acted in bad faith, the award of counsel's fees will not be disturbed absent an abuse of discretion. *Brenkle v. Arblaster, supra.*

The record shows the defendants were fully aware that the counterclaim, alleging plaintiff's work was incomplete, defective and in violation of the electrical code, had no reasonable basis and was bogus when filed on September 8, 1989.

Robinson, for example, testified that his architect Blitz did not even ask Steven Shore or Steven Gold to inspect the job for defects until after the plaintiff brought suit

on February 13, 1989, four years after the certificate of completion was signed. (Shore did not examine the job until April of 1990, seven months *after* the counterclaim was filed.) Ivan Blitz stated that he omitted the alleged ceiling wiring problem from the punch list because he was "a softie" and "being a nice guy and overlooking," he then conceded that the alleged defective wiring has never been changed or altered in any way.

Steven Shore, the defendants' expert and a consulting electrical engineer, testified the power distribution system installed by the plaintiff was in compliance with the National Electrical Code. He also stated that the owner of the building has never complained about any of the plaintiff's work, that he, himself had not observed any wiring lying on the ceiling, and that the emergency shut-off switches which appeared only on the Shore plans have never been installed. All the items referred to by Shore were either not violations of the National Electrical Code or related to work which was not part of the plaintiff's contract.

In sum the record points to no legitimate reason for the defendants' refusal to pay for plaintiff's work, and further demonstrates that defendants were fully aware plaintiff's work was complete and in compliance with the electrical code when the counterclaim was brought. The award of counsel fees was thus proper and justified by the defendants' bad faith.

## ORDER SUR
## DEFENDANTS' POST-TRIAL MOTIONS

And now, March 25, 1992, after argument and consideration of briefs, the defendants' motions were denied.